## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GRAHAM B. SPANIER,** | ) | |
| **Petitioner,** | ) | |
| | ) | **Civil Action No. 3:19-CV-523** |
| | ) | |
| **v.** | ) | **(MANNION, D.J.)** |
| | ) | **(MEHALCHICK, M.J.)** |
| | ) | |
| **CHAD LIBBY, et al.,** | ) | |
| | ) | |
| **Respondents** | ) | |

---

## ANSWER TO PETITION
## FOR WRIT OF HABEAS CORPUS

---

AND NOW, come Respondents by their counsel, Josh Shapiro, Attorney General of the Commonwealth of Pennsylvania, and Gregory J. Simatic, Deputy Attorney General, who, in accordance with this Court's April 11, 2019 Order, submits the following Answer to the Petition for Writ of Habeas Corpus filed by Petitioner, Graham B. Spanier:

**PRELIMINARY MATTERS**:

To the best of Respondents' knowledge, transcripts of all prior Court of Common Pleas proceedings are currently available.

Respondents have submitted the required state court filings and opinions as required by the applicable Rule in an Appendix to the instant filing.

# I. INTRODUCTION

## A. FACTUAL HISTORY

On Friday, February 9, 2001, at approximately 8:30 p.m., Michael McQueary, at that time a graduate assistant with the Penn State football program, entered a locker room in the University's Lasch Football Building to drop off a pair of newly-purchased shoes.  Trial Notes of Testimony (hereinafter N.T.) p. 106-107, 139.  Upon entering the locker room, McQueary heard the sound of running showers and what he described as slapping sounds coming from the shower area.  N.T. p. 106-107.  At that time of night, a key was required to access the Lasch Building.  N.T. p. 107.

McQueary looked into the shower area, first via a reflection in a mirror and then directly, and saw Jerry Sandusky and a boy of approximately 10 to 12 years old, both naked in the shower with Sandusky behind the boy in a stomach to back position along with "slow, very subtle movement."  N.T. p. 108-110.  At that time,

Sandusky was a former football defensive coordinator who had retired in 1999 but had been granted special and rather unusual "emeritus" status by the University. N.T. p. 457.  As a result of this special status, Sandusky enjoyed free access to the University's athletic facilities.  N.T. p. 456-457.  This included after-hours access to the Lasch Building.  N.T. p. 459.

McQueary then left the locker room and went upstairs to his office in the Lasch building, where he called his father to seek advice.  N.T. p. 111. After a long discussion at the McQueary family residence between McQueary, his father, and a family friend, it was decided that Head Football Coach Joe Paterno should be informed of the incident.  N.T. p. 113.

Early the following morning, McQueary called Paterno to request permission to come to his home and, upon receiving permission, proceeded to Paterno's residence.  N.T. p. 114-115.  McQueary informed Paterno that he had seen Sandusky naked in a shower with a boy, heard slapping sounds, and saw Sandusky and the boy in skin-on-skin contact.  N.T. p. 116-117.  Paterno told McQueary that he needed time to think and tell someone about the incident, and that he would keep McQueary informed.  N.T. p. 117.

On February 11, 2001, Paterno requested that Timothy Curley come to his home for a meeting.  N.T. p. 357.  There is some discrepancy as to whether or not Gary Schultz also attended this meeting, but it is undisputed that Curley was

present.  N.T. p. 431.  At that time, Curley was Penn State's Director of Intercollegiate Athletics.  N.T. p. 340-341.  Schultz was at that time the University's Senior Vice President for Finance and Business.  N.T. p. 411.  Both Curley and Schultz reported directly to Petitioner Graham Spanier, who was University President at that time.  N.T. p. 341, 418.  At this meeting, Paterno relayed the information that he had been given by McQueary.  N.T. p. 358.

Regardless of whether he learned of the incident from Paterno or later from Curley, upon hearing of the 2001 incident Schultz recalled within "a nanosecond" an earlier incident involving Sandusky that had occurred in 1998.  N.T. p. 434. Curley also was reminded of this 1998 investigation.  N.T. p. 359.   At the time of the 1998 investigation, Sandusky was employed as the defensive coordinator of the Penn State football team.  N.T. 70.  An incident was reported to the University Police wherein Sandusky had showered with two young boys in football locker room and had hugged the boys from behind while naked.  N.T. 75-76.  The boys were identified as participants in Sandusky's organization for troubled or underprivileged youth known as The Second Mile.  N.T. p. 48.  Schultz was informed about this 1998 incident by the Director of the University Police almost immediately after it was reported.  N.T. p. 78.  Schultz, in turn, informed Curley and Spanier.  N.T. p. 419, 422-423.   In addition to the Penn State University Police Department, the Centre County District Attorney's Office and the

4

Pennsylvania Department of Public Welfare participated in the investigation of the 1998 incident.  N.T. p. 421.  Schultz kept both Curley and Spanier informed throughout the 1998 investigation.  N.T. p. 427.  At the conclusion of the 1998 investigation, the Centre County District Attorney decided that no criminal charges would be filed against Sandusky.  N.T. p. 92.  Schultz hoped that Sandusky had "learned his lesson" from the 1998 incident and would refrain from bringing children into campus showers in the future.  N.T. p. 428.

After a regularly scheduled meeting of the University "President's Council" on February 12, 2001, Curley and Schultz had a private meeting with Spanier wherein they discussed the 1998 and 2001 incidents.  N.T. p. 434-435.  There had been no firsthand interview of McQueary at this point by any of the three men.  Spanier, Schultz, and Curley nevertheless formulated a plan to address the new incident, in which Curley was assigned the lead role by Spanier.  N.T. p. 435.  Per Spanier's orders, Schultz was to be kept apprised of the status of the plan.  N.T. p. 436.  No progress was made on this plan for some time, apparently due to Curley's lack of initiative.  N.T. p. 438.

Approximately a week to 10 days after his meeting with Paterno, McQueary was summoned to Penn State's Bryce Jordan Center for a meeting with Curley and Schultz.  N.T. p 118.  Curley and Schultz asked McQueary to tell them about the incident that he had reported to Paterno.  N.T. p. 119.  McQueary told them that he

saw Jerry Sandusky molesting a boy in the shower, their positioning, the fact that the incident was sexual in nature, and that McQueary felt that Sandusky's behavior was "way over the line" and "very sexual". N.T. p. 119, 133. McQueary felt that he had made it abundantly clear that this incident was sexual in nature "without a doubt." N.T. p. 119-120. Curley did most of the talking in the meeting, and McQueary was informed that the matter was being taken seriously and would be investigated, and that he could expect to be contacted again in the future about the incident. N.T. p. 120. Within the Penn State hierarchy, the chief of the University Police reported directly to Schultz. N.T. p. 412. Knowing that Schultz oversaw the University Police Department, McQueary believed that when he was talking to Schultz he was effectively speaking to the police. N.T. p. 121.

A week to ten days after the 2001 meeting with McQueary, Curley called McQueary and told him that Sandusky had been instructed not to bring children to Penn State facilities in the future. N.T. p. 122. McQueary continued to see Sandusky in the Lasch Building and workout facilities, although unaccompanied by children. N.T. p. 123. This nevertheless disturbed McQueary. Id.

On February 25, 2001, Spanier, Curley, and Schultz met at the Bryce Jordan Center before a women's basketball game to discuss the Sandusky situation again. N.T. p. 443. Curley and Schultz recounted for Spanier the account of the incident that McQueary had given at their meeting with him. N.T. p. 443.

6

On February 26, 2001, Schultz sent Curley an email outlining a three-part plan of action that entailed informing Sandusky he was no longer to bring children into University locker rooms, informing the chair of The Second Mile of the incident, and contacting the Department of Public Welfare.  N.T. p. 446-447; Commonwealth's Exhibit 11.  On February 27, 2001, Curley emailed Spanier and Schultz seeking to change the plan.  Curley wrote:

> I had scheduled a meeting with you this afternoon about the subject we discussed on Sunday.  After giving it more thought and talking it over with Joe yesterday, I am uncomfortable with what we agreed were the next steps.  I am having trouble with going to everyone but the person involved.  I think I would be more comfortable meeting with the person and tell him about the information we received.  I would plan to tell him we are aware of the first situation.  I would indicate we feel there is a problem and we want to assist the individual to get professional help.
>
> Also, we feel a responsibility at some point soon to inform his organization and maybe the other one about the situation.  If he is cooperative we would work with him to handle informing the organization; if not we do not have a choice and will inform the two groups.
>
> Additionally, I will let him know that his guests are not permitted to use our facilities.  I need some help with this one.  What do you think about this approach?"

N.T. p. 449-450; Com. Ex. 19.

Spanier responded:

> "This approach is acceptable to me.  It requires you to go a step further and means that your conversation will be all the more difficult, but I admire your willingness to do that and I am supportive.  The only

> downside for us is if the message isn't heard and then we
> become vulnerable for not having reported it.  But that
> can be addressed down the road.  The approach you
> outline is humane and a reasonable way to proceed."

N.T. p. 450; Com. Ex. 19.

Schultz later assented to this new plan as well.  N.T. p. 451; Com. Ex. 19.

Had Spanier wanted to pursue a different course of action, however, he had the

undisputed authority to order Curley and/or Schultz to change the plan.  N.T. p.

396, 455.  Eventually, Schultz was informed that "everything was handled" by a

source that he believed to have been Spanier.  N.T. p. 418.  No measures were ever

taken to actually enforce the directive that Sandusky not bring children into the

Penn State athletic facilities.  N.T. p. 396-397.

When Curley eventually contacted The Second Mile about the 2001

incident, he related that the incident had been investigated, and that nothing

inappropriate had been found to have occurred.  N.T. p. 198-199.  No mention of

nudity, physical contact, or sexual impropriety was made to The Second Mile.  Id.

No report of the 2001 incident witnessed by McQueary was catalogued in the

Pennsylvania Childline repository of reports of suspected child abuse.  N.T. p. 327-

328.

Sandusky enjoyed free access to Penn State athletic facilities for years after

McQueary's 2001 report.  N.T. p. 128.  This situation allowed another child to be

molested by Sandusky in the Lasch Building showers. N.T. p. 407.  In contrast,

McQueary was immediately and unceremoniously banned from all university facilities after knowledge of Sandusky's crimes became public.  N.T. 128.

After his crimes came to light, a jury convicted Sandusky of 45 counts relating to the sexual abuse of young boys. See <u>Commonwealth v. Sandusky</u>, 77 A.3d 663, 666 (Pa. Super. 2013); N.T. p. 331; Com. Ex. 15.  In addition to the 2002 victim described above, these victims included three other boys who were abused after McQueary's report to the University administration.  N.T. p. 333.


## B. PROCEDURAL HISTORY

As a result of overseeing and approving an inadequate institutional response to McQueary's report, Spanier was charged with one count of Endangering the Welfare of Children (EWOC) (violating a duty of care, protection, or support), 18 Pa.C.S. §4304(a)(1), one count of Endangering the Welfare of Children (in an official capacity, prevents or interferes with the making of a report of suspected child abuse), 18 Pa.C.S. §4304(a)(2), and one count of Criminal Conspiracy to commit EWOC, 18 Pa.C.S. §903.  There was extensive pretrial litigation, which is largely irrelevant to the resolution of the instant matter.  The case was tried before a Dauphin County jury from March 20 to March 24, 2017, with the Honorable John A. Boccabella, Senior Judge, presiding.   At the conclusion of trial, Spanier

was found guilty of Count 1, EWOC under §4304(a)(1), charge and acquitted of the other two counts.

On June 2, 2017, Spanier was sentenced to 4 to 12 months of incarceration. He filed a post-sentence motion on June 8, 2017, that was denied on July 5, 2017. An appeal to the Superior Court of Pennsylvania followed and, on June 26, 2018, Spanier's judgment of sentence was affirmed. See Commonwealth v. Spanier, 192 A.3d 141 (Pa. Super. 2018). Application for reargument was denied by the Superior Court on September 7, 2018. A petition for allowance of appeal to the Pennsylvania Supreme Court was filed on October 8, 2018 and denied on February 21, 2019. See No. 639 MAL 2018, 2019 WL 759636. The instant habeas petition was filed on March 22, 2019.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies in this case. AEDPA modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). Under this Act, an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the

merits in State court proceedings unless the adjudication of the claim resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. §2254(d)(1).  The question under AEDPA is not whether a federal court

believes the state court's determination was incorrect but whether that

determination was unreasonable, a substantially higher threshold.  Schriro v.

Landrigan, 550 U.S. 465, 473, (2007).

In this context, clearly established Federal law is defined as "the holdings, as

opposed to the dicta, of this [U.S. Supreme] Court's decisions as of the time of the

relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412 (2000). "A

state-court decision is 'contrary' to this Court's clearly established precedents if it

applies a rule that contradicts the governing law set forth in our cases, or if it

confronts a set of facts that is materially indistinguishable from a decision of this

Court but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005).

"A state-court decision involves an 'unreasonable application' of this Court's

clearly established precedents if the state court applies this Court's precedents to

the facts in an objectively unreasonable manner." Id.

The court may grant relief under the "unreasonable application" clause if the

state court correctly identifies the governing legal principle from a decision but

unreasonably applies it to the facts of the particular case. Williams v. Taylor, 529

U.S. at 407-408. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011). The state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." White v. Woodall, 572 U.S. 415, 420 (2014).

The failure by a state court to cite to federal standards does not entitle a petitioner to *de novo* review. As explained by the U.S. Supreme Court in Early v. Packer, 529 U.S. 362, 405-406 (2000), avoiding Williams v. Taylor pitfalls does not require citation of Supreme Court cases—indeed, it does not even require awareness of those cases, so long as neither the reasoning nor the result of the state-court decision contracts them. The Third Circuit has recognized that the Supreme Court has clearly held that the §2254(d) standards apply when a state supreme court rejects a claim without giving any indication of how it reached its decision. Chadwick v. Janecka, 312 F.3d 597, 606 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000) (affirming state supreme court's rejection of a claim without explanation, concluding that the adjudication was neither "contrary to" nor involved an "unreasonable application of," any of its decisions)).

Relief may also be granted if the state courts' adjudication of the claim resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding. 28 U.S.C. §2254(d)(2).

The statute governing habeas relief "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.' " Wilson v. Corcoran, 562 U.S. 1, 6 (2010) (*per curiam*) (quoting 28 U.S.C. §2254(a)). Federal habeas corpus relief does not lie for errors of state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991). "A 'mere error of state law' is not a denial of due process." Engle v. Isaac, 456 U.S. 107, 121, n. 21 (1982).

## III. TIMELINES OF PETITION

28 U.S.C.A. §2244(d)(1)(A) provides that a one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period runs from the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.  There is no dispute in this case that Spanier has filed his petition in a timely fashion, well within the applicable one-year limitation period.

## IV. EXHAUSTION

The Anti-terrorism and Effective Death Penalty Act's exhaustion requirement mandates that a federal constitutional claim "must have been 'fairly presented' to the state courts." <u>Bronshtein v. Horn</u>, 404 F.3d 700, 725 (3d Cir. 2005) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)).  This entails presenting the facts and legal theory associated with each claim through "one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999).  Fair presentation "means that a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." <u>Id.</u> at 725.

To satisfy the "fair presentation" requirement, the state court pleadings must demonstrate that the legal theory and supporting facts asserted in the federal habeas petition are "substantially equivalent" to those presented to the state courts, see <u>Doctor v. Walters</u>, 96 F.3d 675, 678 (3d Cir.1996), and that the method of legal analysis to be applied in federal court was available to the state courts.  See <u>McCandless v. Vaughn</u>, 172 F.3d 255, 261 (3d Cir.1999). "It is not sufficient that all the facts necessary to support the federal claim were before the state courts," <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982), and "mere similarity of claims is insufficient to exhaust." <u>Duncan v. Henry</u>, 513 U.S. 364, 366 (1995).

If a claim has not been fairly presented to the state courts, but further state court review is clearly foreclosed under state law, exhaustion is excused on the ground of futility.  Lines v. Larkin, 208 F. 3d 153, 160 (3d Cir. 2000).  Under these circumstances, the claim is considered procedurally defaulted, not unexhausted, and the claim may be entertained in a Federal habeas petition only if there is a basis for excusing the procedural default.  Wenger v. Frank, 266 F. 3d 218, 223 (3d Cir. 2001).

Review of defaulted claims is prohibited unless the petitioner is able to "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." Coleman v. Thompson, 501 U.S. 722, 750 (1991). The Supreme Court has identified three circumstances in which procedural default may be excused for cause: (1) if the "factual or legal basis for a claim was not reasonably available to counsel," (2) "if some interference by officials made compliance [with state procedural rules] impracticable," or (3) "if the procedural default is the result of ineffective assistance of counsel." Murray v. Carrier, 477 U.S. 478, 488 (1986).  If cause is established, a petitioner must then also demonstrate actual prejudice as a result of the procedural default.  Actual prejudice requires that the petitioner "shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his

actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982).

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750.

In the interests of efficiency, Respondents will address exhaustion or procedural default of each of Petitioner's claims in conjunction with their merits below.

## V. MERITS OF PETITIONER'S CLAIMS

### A. ALLEGED EX POST FACTO APPLICATION OF 2007 LAW TO 2001 CONDUCT

Spanier first alleges that his conviction was based on language that was added to the Pennsylvania EWOC statute in 2007 and retroactively criminalized conduct that was not criminal in 2001. He maintains that he was convicted of violating the 2007 version of the statute and that the state courts upheld his conviction on the basis of the 2007 statute. This is not the case. No state court has ever held that the 2007 EWOC statute was retroactively applicable to Spanier, that the jury was instructed to apply the 2007 statute as opposed to the 2001 statute, or that he had been convicted under the 2007 statute. Instead, the Pennsylvania courts have ruled, as a matter of state law, that the version of the Pennsylvania EWOC statute that was in effect in 2001, the time of Spanier's crime, encompassed and rendered criminal the same conduct as did the 2007 version and that instructing the jury to that effect was therefore proper. The 2007 version of the EWOC statute is relevant to this case only in that it made explicit the prohibition of certain conduct, such as Spanier's, that has been held to exist within the 2001 version of the statute. Spanier, 192 A.3d at 152-154.

Federal courts deciding habeas petitions do not serve as appellate courts to review state court decisions of state law claims. Their purpose instead is to review whether the circumstances surrounding the petitioner's detention "violate

fundamental liberties of the person, safeguarded against state action by the Federal

Constitution." <u>Townsend v. Sain</u>, 372 U.S. 293, 311-312 (1963). Habeas petitions

may not simply repackage state law claims, which have previously been found to

be meritless, in order to obtain review. <u>DiGuglielmo v. Smith</u>, 366 F.3d 130, 136

(2d Cir. 2004).

As outlined above, the outcome of this case, especially on this particular

issue, hinged solely on state judicial interpretation of a state criminal statute.  It has

long been settled by Constitutional text and Supreme Court precedent that the *Ex*

*Post Facto* Clause does not apply to judicial decision-making.  <u>Rogers v.</u>

<u>Tennessee</u>, 532 U.S. 451, 462 (2001). The *Ex Post Facto* Clause is, instead, a

limitation upon the powers of the Legislature, see <u>Calder v. Bull</u>, 3 Dall. 386, 1 L.

Ed. 648 (1798), and does not of its own force apply to the Judicial Branch of

government.  <u>Frank v. Mangum</u>, 237 U.S. 309, 344 (1915); <u>Marks v. United States</u>,

430 U.S. 188, 191 (1977).

As such, a Due Process claim premised on overbroad judicial statutory

interpretation is the only proper avenue by which Spanier may now pursue relief

on this issue.  All that due process requires is that the law give sufficient warning

that men may conduct themselves so as to avoid that which is forbidden.  <u>Rose v.</u>

<u>Locke</u>, 423 U.S. 48, 50 (1975).  Only if a judicial construction of a criminal statute

is 'unexpected and indefensible by reference to the law which had been expressed

prior to the conduct in issue,' is retroactive application of said construction prohibited.  Bouie v. City of Columbia, 378 U.S. 347, 354 (1964); Rogers v. Tennessee, 532 U.S. at 457.

AEDPA mandates that petitioners demonstrate that they have "exhausted the remedies available in the courts of the State" before seeking federal habeas relief. 28 U.S.C. §2254(b)(1)(A). An exhausted claim is one that has been "fairly presented" to the state courts "by invoking one complete round of the State's established appellate review process," and which has been adjudicated on the merits. Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002); see also Johnson v. Williams, 568 U.S. 289, 302 (2013).  The purpose of this requirement is to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.  Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971).  The requisite fair presentation also serves the purpose of alerting the state courts to the federal nature of the claim. Duncan, supra, at 365–366; O'Sullivan v. Boerckel, 526 U.S. at 845; Baldwin v. Reese, 541 U.S. 27, 29 (2004).  A petitioner is said to have fairly presented a claim when he asserts "the factual and legal grounds of the federal claim with sufficient precision to give the state court notice." Adams v. Kyler, No. 01-0627, 2002 WL 1896385, at (E.D. Pa. Aug. 15, 2002) (citing Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001)).

Spanier has previously and repeatedly, albeit unsuccessfully, argued that the state courts' determination of the scope of the conduct criminalized by the 2001 EWOC statute was incorrect as a matter of state law. He has also repeatedly argued that the state courts improperly upheld his conviction on the basis of the 2007 EWOC statute and/or applied the 2007 statute to him and that this constituted improper ex post facto activity. Challenging a ruling on the basis of state law and/or distinguishable, inapplicable federal law does not satisfy AEDPA's fair presentation and exhaustion requirements. Spanier never meaningfully argued that the judicial interpretation of the 2001 state statute that actually controlled the outcome of this case violated his federal Due Process rights under Bouie and its progeny.

That is, a petitioner is said to have fairly presented a claim when he asserts "the factual and legal grounds of the federal claim with sufficient precision to give the state court notice." Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001)). The entirety of Spanier's argument on this issue in his 62-page superior Court brief, ensconced within his significantly more extensive ex post facto argument, was as follows:

> And if this Court upholds the retroactive application of the statute to Dr. Spanier, this would violate his due process rights. See Marks v. United States, 430 U.S. 188, 191-92 (1977); Commonwealth v. Davis, 760 A.2d 406, 410 (Pa. Super. 2000); U.S. CONST. amend XIV, § 1; PA. CONST. art. 1, § 9.

Brief of Appellant in No.1093 MDA 2017 at 52.

It is unclear exactly what Spanier was arguing here.  He fell far short of pointing the state court to a genuine federal constitutional due process issue.  One would logically infer from his use of the word "statute" that he was taking issue with the alleged retroactive application of the 2007 statute to his case, which, as previously discussed, had already been determined not to have occurred and would thus require no further attention from the state courts.

Nothing in Spanier's argument would put the state court fairly on notice that he was challenging the application of the state courts' interpretation of the 2001 EWOC statute to him.  By Spanier's admission, he presented the identical claims to the Court of Common Pleas and the Superior Court.  See Petition paragraph 14a. A properly developed "fair warning" Due Process claim was not among them. Federal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development. See, e.g., United States v. Cloud, 680 F.3d 396, 409, n. 7 (4th Cir. 2012); United States v. Mitchell, 502 F.3d 931, 953, n. 2 (9th Cir. 2007); United States v. Charles, 469 F.3d 402, 408 (5th Cir. 2006); Reynolds v. Wagner, 128 F.3d 166, 178 (3rd Cir. 1997); Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983). State appellate courts are entitled to follow the same practice. Johnson v. Williams, 568 U.S. 289, 299 (2013).

In <u>Baldwin v. Reese</u>, 541 U.S. 27 (2004), the Supreme Court held that state appellate courts were not required to read lower court opinions and thereby attempt to parse out an appellant's federal constitutional claims. Here Spanier's undeveloped and, at best, ambiguous invocation of federal due process principles lacks any discussion of how these legal concepts would apply to the facts and circumstances of his case. State courts attempting to address the merits of Spanier's due Process claims would not only have had to take a detour into his cited caselaw, but also attempt to infer what his actual argument on this point might have been. The state courts would have had to attempt to determine if Spanier intended to challenge the alleged application of the 2007 statute to his case or if he instead took issue with the judicial interpretation of the 2001 statute and, in effect, the courts would have to assume the role of his advocate. Respondent respectfully submits that this stretches the already rather elastic definition of fair presentation beyond the breaking point.

Given that Spanier has already exhausted his direct appeal and that the issue was waived under the Pennsylvania Post Conviction Relief Act, 42 Pa.C.S. §9544(b), Respondent submits that it should be deemed to have been procedurally defaulted. Generally, if a prisoner has procedurally defaulted on a claim by failing to raise it in state-court proceedings, a federal habeas court will not review the merits of the claim even if it implicates constitutional concerns. <u>Martinez v. Ryan</u>,

566 U.S. 1, 9 (2012) (citing <u>Coleman v. Thompson</u>, 501 U.S. at 747-48;

<u>Wainwright v. Sykes</u>, 433 U.S. 72, 84-85 (1977)).

If this Court finds that Spanier's claim on this issue was, in fact, fairly

presented to the state courts, the claim should then be presumed to have been

adjudicated on the merits by the state courts, even if not specifically addressed in

the opinions, and AEDPA deference would apply.  <u>Johnson v. Williams</u>, 568 U.S.

289, 293, (2013).

The version of the 18 Pa.C.S. §4304 Endangering Welfare of Children

statute in effect in 2001 provided, in pertinent part, that "a parent, guardian, or

other person supervising the welfare of a child under 18 years of age commits an

offense if he knowingly endangers the welfare of the child by violating a duty of

care, protection or support."  This statute was amended in 2007 to provide, in

pertinent part, that "a parent, guardian, or other person supervising the welfare of a

child under 18 years of age, ***or a person that employs or supervises such a person***,

commits an offense if he knowingly endangers the welfare of the child by violating

a duty of care, protection or support." (Emphasis added).

As a matter of state law, Spanier's conduct has been held to be criminal

under the 2001 statute.  The only claims cognizable in a federal habeas corpus

action are that a state conviction was obtained in violation of some right

guaranteed by the United States Constitution or other federal law. See 28 U.S.C. §

2254(a) (federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in state custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); <u>Estelle</u>, 502 U.S. at 67–68, 112 S. Ct. 475 (noting that federal courts may not review or grant relief for a claim that a state conviction was obtained in violation of state law); <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

Spanier alleges that because the 2007 statute explicitly lists "a person that employs or supervises such a person" as being covered by the statute, that such a person was, by negative implication, not within the ambit of the previous statute. This issue was addressed in depth by the Superior Court in its opinion.  In the course of reviewing Spanier's case, the Superior Court recognized that the Pennsylvania Supreme Court had addressed proper construction of the 2001 EWOC statute and delineated its scope in <u>Commonwealth v. Lynn</u>, 114 A.3d 796, 818 (Pa. 2015), holding that:

> Generally speaking, under the rule of lenity, penal statutes are to be strictly construed, with ambiguities resolved in favor of the accused. In the peculiar context of EWOC, however, we have held that the statute is protective in nature, and must be construed to effectuate its broad purpose of sheltering children from harm. Specifically, the purpose of such juvenile statutes is

24

defensive; they are written expansively by the legislature to cover a broad range of conduct in order to safeguard the welfare and security of our children. In the context of protective juvenile legislation, therefore, we have sanctioned statutes that, rather than itemizing every undesirable type of conduct, criminalize instead the conduct producing or tending to produce a [c]ertain defined result[.] We have accordingly observed:

The common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it.

Commonwealth v. Spanier, 192 A.3d 141, 151 (Pa. Super. 2018) (citing

Commonwealth v. Lynn, 114 A.3d 796, 818 (Pa. 2015)) (internal citations and

quotation marks omitted).

The Pennsylvania Supreme Court previously concluded that sufficient

evidence supported Lynn's conviction under the 2001 statute even though he did

not directly supervise any children. The conviction stood because "that which is

supervised is the child's welfare." Lynn, 114 A.3d at 824. The Court found the

statute to be "plain and unambiguous on that point." Id. at 823. "By requiring

supervision of the child's welfare rather than of the child, the statute endeavors to

safe-guard the emotional, psychological, and physical well-being of children." Id.

"[S]upervision is routinely accomplished through subordinates, and is no less

supervisory if it does not involve personal encounters with the children." Id. at

824.  Quoting the <u>Lynn</u> Opinion, the Superior Court in Spanier's case noted, "A

subsequent change in language does not retroactively alter the legislative intent

that is apparent in the plain language of the prior version of the statute." <u>Spanier</u>,

192 A.3d at 154, citing <u>Lynn</u>, 114 A.3d at 827. The <u>Lynn</u> Court upheld the

defendant's conviction under the pre–2007 version of EWOC as a supervisor even

though the pre–2007 did not expressly apply to a person "who employs or

supervises" someone supervising the welfare of a child.  Addressing the

comprehensibility of the 2001 EWOC statute, the <u>Lynn</u> court explained that:

> In the face of a challenge to the EWOC statute as being unconstitutionally vague, being cognizant of the protective purpose of such juvenile acts, we held the EWOC criminal statute was not facially unconstitutionally imprecise. <u>Commonwealth v. Mack</u>, 359 A.2d 770, 772 (1976). We considered that the language contained therein, specifically, "endangers the welfare of the child" and "duty of care, protection or support," are not esoteric; rather, we discerned that they are easily understood and given context by the community at large. <u>Id</u>. Accordingly, we reasoned that "an individual who contemplates a particular course of conduct will have little difficulty deciding whether his intended act 'endangers the welfare of the child' by his violation of a 'duty of care, protection or support.' " <u>Id</u>.24

<u>Commonwealth v. Lynn</u>, 114 A.3d 796, 818 (Pa. 2015).

The Superior Court then went on to address the 2001 EWOC statute's

particular applicability to Spanier, finding that:

> To hold that Appellant was not supervising a child's welfare when he oversaw PSU's response to the Sandusky allegations, or to hold that he owed no duty of care in his exercise of that supervisory authority, would plainly not effectuate the purpose of sheltering children from harm. Similarly, we cannot believe that the common sense of the community would find that Appellant owed no duty of care in discharging his supervisory role. See Lynn, 114 A.3d at 818 (" 'Duty of care, protection, and support' are not esoteric; rather, [...] they are easily understood and given context by the community at large.") On the facts before us therefore, we conclude that Appellant was supervising the welfare of a child and owed a duty of care to the child. We need not decide whether and to what extent the supervisory role and the duty of care overlap in all cases.

Commonwealth v. Spanier, 192 A.3d 141, 153 (Pa. Super. 2018).

In light of this eminently reasonable state court interpretation of the 2001 EWOC statute, it cannot be said that Spanier was deprived of fair warning that his woefully deficient response to a report of Sandusky's predations could subject him to criminal culpability.  The 2001 EWOC statute was intended to be interpreted broadly so as to effectuate its statutory purpose and this was both contemplated at the time of enactment and quite foreseeable.  By any logical thought process and applying accepted principles of agency, a person who oversees those with a responsibility for supervising the welfare of children is himself also supervising their welfare.  No civilized system of justice could, would, or should countenance the evasion of the duty to protect children on the part of those in positions of power by allowing them to shirk responsibility for actions of their subordinates of which

they knew and approved.   This is particularly true when children frequently came to the Penn State campus not only as licensees but also as invitees.  Spanier has therefore failed to establish a valid due process claim. The state courts' holdings were neither contrary to, nor an unreasonable application of, clearly established federal law, nor were they based on an unreasonable factual determination.  There is no valid basis on which to grant habeas relief on this claim, particularly given the AEDPA deference due the state court judgement.

**B**.   **JURY INSTRUCTION**

Spanier next alleges that the trial court's jury instruction impermissibly allowed him to be convicted under the 2007 EWOC statute for his 2001 conduct. Respondent submits that this is a gross mischaracterization of what actually happened.  The case hinged on a judicial determination of the statutory scope of the 2001 EWOC law and is thus inextricably linked to issue A above.  The state courts have determined, as a matter of state law, that the jury instruction given was proper because the 2001 and 2007 EWOC statutes were functionally coextensive and Spanier's EWOC jury instruction, although incorporating the language added to the statute in 2007, accurately reflected the law as it existed in 2001 under the version of the statute then in effect.

In other words, the instruction given was a proper expression of the 2001 law.  There was never a holding that the 2007 statute applied to Spanier, but

instead a judicial finding that the 2001 statute encompassed his conduct.  He was convicted under the 2001 statute and only that statute, and the jury instruction given has been ruled to have reflected as much.

A review of Spanier's state court filings reveals that he raised only state law-based and *ex post facto*[1] challenges to the jury instruction, the latter of which, as previously discussed, are inapplicable to judicial determinations.  The only way this determination could now be assailed would be through a <u>Bouie</u> due process/"fair warning" attack on the underlying statutory interpretation, which, as noted previously, Spanier has defaulted by failing to properly articulate and/or develop. Where there is no basis on which to find that the state courts' interpretation of a state law was constitutionally impermissible, there can logically be no basis on which to find that a jury instruction derived from that interpretation was improper.  The propriety of the underlying statutory construction has been decided as a matter of state law and there is no extant avenue by which Spanier can now attack that determination in these proceedings.  Respondent therefore respectfully submits that this claim has also been procedurally defaulted and is foreclosed from review.

---

[1] Spanier's continued insistence that he was convicted under the 2007 EWOC statute and a jury instruction derived therefrom, rather than a judicial interpretation of the 2001 version of the statute frames his claim as one exclusively based on ex post facto principles.

Even if it had been properly raised, such a claim is substantively meritless. If this Court finds that Spanier's claim on this issue was, in fact, fairly presented to the state courts, the claim should then be presumed to have been adjudicated on the merits by those state courts, even if not specifically addressed in their opinions, and AEDPA deference applies. Johnson v. Williams, 568 U.S. 289, 293, (2013).

"Questions related to jury charges are normally matters of state law and are not cognizable in federal habeas review." Engle v. Isaac, 456 U.S. 107 (1982); Henderson v. Kibbe, 431 U.S. 145 (1977); Zettlemoyer v. Fulcomer, 923 F.2d 284, 309 (3d Cir. 1991). The paramount question on habeas review of a jury instruction is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," Estelle, 502 U.S. at 73, and "not merely whether the instruction is undesirable, erroneous, or even universally condemned." Jacobs v. Horn, 395 F.3d 92, 111 (3d Cir. 2005). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle, 502 U.S. at 67–68.

As discussed above, the state courts have cogently and thoroughly explained why, as a matter of Pennsylvania law, Spanier's 2001 conduct fell within the foreseeable ambit of the EWOC statute in effect at that time and why inclusion of the updated statutory language in the jury instruction was therefore proper. Spanier, 192 A.3d at 150-154. This decision was neither contrary to, nor an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States, nor did it result in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding.  There is no valid basis on which to grant habeas relief

on this claim, particularly given the AEDPA deference due the state court

judgement.

## C.     STATUTE OF LIMITATIONS

Spanier's third and final argument is that he was unconstitutionally deprived

of notice of potential exceptions to the EWOC statute of limitations.  Pursuant to

28 U.S.C. §2254(b)(1)(A), the federal courts may grant a state prisoner's habeas

petition only if the petitioner "has exhausted the remedies available in the courts of

the State." AEDPA's exhaustion requirement mandates that the federal claim "must

have been 'fairly presented' to the state courts." Bronshtein v. Horn, 404 F.3d at

725. Fair presentation "means that a petitioner must present a federal claim's

factual and legal substance to the state courts in a manner that puts them on notice

that a federal claim is being asserted." Id.  Spanier has previously couched his

challenges to the state courts' rulings on this issue exclusively as questions of state

law, specifically relying upon 42 Pa.C.S. §5552(c)(3) and associated state

precedent, which means he has failed to exhaust and thereby procedurally defaulted[2] any federal claims on this issue.

Even if this issue had been presented properly, it would be meritless.  It is well-established that state courts are the ultimate expositors of state law.  <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691 (1975).  State court rulings on questions of state law are binding in federal habeas proceedings.  <u>Priester v. Vaughn</u>, 382 F.3d 394, 402 (3d Cir. 2004).  Here, after extensive analysis of the issue, the state courts found, that Spanier was subject to a state law exception to the otherwise applicable state statute of limitations and was properly put on notice of this fact by the known evidence and allegations in the case.  <u>Spanier</u>, 192 A.3d at 145-151.  There is no valid basis on which to disturb that finding.

---

[2] Spanier has already exhausted his direct appeal and has waived this claim for PCRA purposes by failing to raise it on direct appeal.  42 Pa.C.S. §9544(b). If found not to have been exhausted, it is thus procedurally defaulted.

## VI. CONCLUSION

WHEREFORE, for the foregoing reasons, Respondents respectfully request

that this Honorable Court enter an order dismissing Petitioner Graham B. Spanier's

Petition for Writ of Habeas Corpus.

**Respectfully submitted,**

**s/ Gregory J. Simatic**
**Deputy Attorney General**
**Attorney No. #201019**
**(412) 565-5339**

**gsimatic@attorneygeneral.gov**

**OFFICE OF ATTORNEY GENERAL**
**Criminal Law Division**
**Appeals and Legal Services Section**
**1251 Waterfront Place, Mezzanine Level**
**Pittsburgh, PA 15222**

**Date: April 19, 2019**